# EXHIBIT B

# MEYER, FORD, GLASSER & RADMAN

ATTORNEYS AT LAW

STEPHEN P. MEYER
LARRY O. FORD
MICHAEL L. GLASSER
SCOTT S. RADMAN
SEAN W. COOK

OF COUNSEL:
LETISHA R. BIKA
Also Licensed in Kentucky

P. O. Box 11090
Charleston, WV 25339-1090

Email:
larry.ford@meyerandford.com

120 Capitol Street
Charleston, WV 25301

Telephone 304-345-3900
Facsimile 304-345-3935

November 16, 2010

Jaime S. Tuite, Esquire
Buchanan Ingersoll & Rooney, PC
One Oxford Centre
301 Grant St., 20th Floor
Pittsburgh, PA 15219-1410

RE:   Cecil Hypes v. Maxim Crane Works

Dear Ms. Tuite:

Since our telephone conversation I have discussed possible resolution of this claim with Mr. Hypes. Mr. Hypes tells me that whatever interest he may have in the past of returning to work no longer exists and that he is strictly interested in discussing a settlement with Maxim Crane which would not contemplate his returning to work with the company. I apologize for the miscommunication on that subject.

The chronology shows that Maxim was guilty of both age discrimination, failure to provide reasonable accommodation to a person with a disability and/or discrimination against a person perceived as disabled. There are various events of significance which occurred during the time that Mr. Hypes was employed by Maxim leading to this conclusion.

Mr. Hypes started employment with Maxim on March 1, 1997, and had quadruple bypass open heart surgery in July of 2005. He was out on sick leave until January 2006 but was still working from home. He returned to full time work in January 2006.

In April 2006, Mr. Hypes was offered a personal trainer, 6 to 9 months off work with compensation, and a nutritionist so he could get into shape. Mr. Hypes declined the offer. Jimmy Morris was hired from All Crane, a competitor, in 2007

and in April of the following year became branch manager of the Nitro branch to which Mr. Hypes was assigned. In April 2008 Dave Barnett, Senior Vice President of Special Projects, called Mr. Hypes into a meeting with himself and Jimmy Morris and directed Mr. Hypes to report to the office each morning at 7:00 am and give Mr. Morris an itinerary of his day. Mr. Hypes was told that the reason for these checks on performance was to make sure that he was correctly performing his duties. Mr. Hypes states that he is not aware of any previous problems or complaints about his performance. Mr. Hypes called Brian Carlisle, Senior Vice President of the mid-west region, to ask about these directions and was told to disregard the directive and that he should continue to do his job the way he had been doing it. Subsequently, in June of 2008, Mr. Hypes received an email from Jimmy Morris stating that Bob Edmonston would be coming down to ride with Mr. Hypes to observe the way in which he was performing his job. Edmonston was not a member of the Human Resources department but was a person who was typically assigned to work with the salesmen who were having problems with meeting their goals. Mr. Hypes continued to be unaware of any problems or complaints concerning his performance. Between June and September 2008 Edmonston rode with Mr. Hypes every week and reported back that Hypes was doing a good job and told Mr. Hypes he did not know why the company was having him ride with him on sales calls. During this time, Edmonston reminded Mr. Hypes that Dave Barnett had offered Mr. Hypes short term disability and had directed Edmonston to reconvey the offer. Edmonston told Mr. Hypes that he could take 6 months of short term disability and then go on permanent disability. Mr. Hypes called Bob Carlisle and reported the conversation.

In August 2008 Carl Porta, age 40, was hired as a new sales person. Porta was a friend of Jimmy Morris. There were three salesmen at the Nitro branch, Mr. Hypes, Porta and Gary Haslett whose age was approximately the same as Mr. Hypes'. Later that year, Mr. Hypes was directed by Barnett, Carlisle and Morris to give some of his customers to Porta.

In March 2010, Mr. Hypes began seeing a chiropractor for his back problems. An MRI was done and Dr. Osbourne of St. Mary's Medical Center said that Mr. Hypes was not a candidate for back surgery.

In April 2010, Mr. Hypes was called into a meeting with Morris and was told that he was "getting some age on him", asked how old he was and when he planned on retiring. Mr. Hypes replied, "probably at age 66." He was then directed to train Mr. Samples who was hired as a safety man two years before.

On May 6, 2010, Mr. Hypes called Morris and informed him of problems with his back and that his doctor told him not to drive. Mr. Hypes told Morris that he needed to go on light duty. Thirty minutes later Mr. Hypes received Workers Compensation forms from Tommy Liston in Human Resources. Liston followed up with Mr. Hypes between May and July requesting that the forms be completed and telling him that he would be terminated if he did not fill out and submit the forms. At this time, there was no doctors report in support of the claim. Mr. Hypes was working from home and there was no decline in sales.

On June 4, 2010, Dr. Roland Meffert submitted a report that Mr. Hypes was being treated for lower back and leg pain since March 15, 2010, and recommending a course of trial pain management. In the letter he noted that Mr. Hypes' condition had been worsened with long periods of driving and sitting and recommended that Mr. Hypes take time off work. Ultimately, though, he approved Mr. Hypes' request to work light duty, meaning working from home.

On June 25, 2010, Mr. Hypes started receiving a disability check although he had never returned disability forms or turned in a report from a doctor. On July 2, 2010, Mr. Hypes did submit disability forms to Human Resources only because he was ordered to do so. He continued to work from home. Between June 25 and August 20, 2010, Mr. Hypes wrote up orders in excess of $250,000.00. On August 20, 2010, Mr. Hypes closed a sale in the morning to Frickie Management and later received a call from Danny Samples telling Mr. Hypes that they needed to pick up his computer and cell phone and that he was not to come to the office. Joe Connally, Senior Vice President of Operations, was with Samples and they met in a parking lot. Within five to ten minutes of the meeting the cell phone had been cut off. Connally told Mr. Hypes at the meeting that he was in bad shape and not coming to work and that he should not do anything "stupid."

As a result of the actions of Maxim Crane, Cecil Hypes sustained a significant loss of earnings. For whatever reason, it appears that Maxim was unwilling to allow Mr. Hypes to work from home which we believe would be a reasonable accommodation for his disability. We also believe that the references to his age going back quite some time prior to his being placed on disability indicate the desire to replace him with a younger man and, in fact, he was directed to train a man younger than him.

The earnings history reflects that Mr. Hypes earned approximately $71,000.00 in 2005, $67,000.00 in 2006, $80,000.00 in 2007, $92,000.00 in 2009 and $87,000.00 in 2010. He would have liked to continued to work until age 70, approximately six years from when he was placed on disability.

November 16, 2010
Page 4

Considering the amount of time that he would like to have continued working and the evidence of discriminatory actions by the company, Mr. Hypes will settle this case for $500,000.00 at this time.

Very truly yours,

LARRY O. FORD

LOF/cmv

cc:   Cecil Hypes

# MEYER, FORD, GLASSER & RADMAN, PLLC

ATTORNEYS AT LAW

| | | |
|---|---|---|
| STEPHEN P. MEYER<br>LARRY O. FORD<br>MICHAEL L. GLASSER<br>SCOTT S. RADMAN<br>SEAN W. COOK<br><br>OF COUNSEL:<br>LETISHA R. BIKA<br>Also Licensed in Kentucky | P. O. Box 11090<br>Charleston, WV 25339-1090 | 120 Capitol Street<br>Charleston, WV 25301<br><br>Telephone 304-345-3900<br>Facsimile 304-345-0270 |

January 13, 2012

**Via Email and U.S. Mail**

Jaime S. Tuite, Esq.
Buchanan Ingersoll & Rooney, PC
One Oxford Center
3012 Grant Street, 20th Floor
Pittsburgh, PA   15219-1410

### Re. Cecil Hypes v. Maxim Crane Works

Dear Ms. Tuite,

  This letter is in response to your January 3, 2012, correspondence. Initially, we would dispute, from both a factual and legal perspective, your representation that Mr. Hypes is currently employed by Maxim, and that the November 24, 2010, offer of employment was unconditional. Nonetheless, Mr. Hypes is willing to continue engaging in good-faith negotiations with regard to his return to work for Maxim as a sales representative.

  As has been discussed *ad nauseam* in this matter, Mr. Hypes' potential return to work must be subject to reasonable accommodations related to his documented medical conditions. Indeed, both before and after Mr. Hypes was relieved of his employment duties, he has desired nothing more than to continue his outstanding service to Maxim and its clients under the reasonable accommodations that he is entitled to by law.

  We appreciate your willingness to now discuss the specifics of such accommodations. Further, we agree that the further involvement of Mr. Hypes treating physicians will be helpful in establishing these necessary accommodations. Accordingly, we propose as follows:

  We will submit the nine inquiries asserted in your January 3, 2012, letter to Dr. Meffert, Mr. Hypes treating chiropractor, and to Dr. Christina Webb, Mr. Hypes general physician. Each of these physicians will then presently conduct an updated examination and consultation with Mr. Hypes, and respond in writing. Should you have additional inquiries, we ask that you submit them immediately for consideration by these physicians.

If, as you have suggested, additional questions arise based on the responses of Mr. Hypes' physicians, then you and I can immediately schedule a conference call with these physicians in which we will both participate.

Furthermore, we believe strongly that a monetary settlement as a prerequisite for Mr. Hypes' return to work is reasonable and consistent with the requirements of the ADA and the West Virginia Human Rights Act. Mr. Hypes has suffered considerable damages as a result of Maxim's conduct up until this point, and deserves to be justly compensated. He is not be required to resume his employment with the cloud of pending litigation hanging over his head regarding the damages he has already suffered. As such, there is no reason that such a monetary settlement cannot be achieved concurrently with an agreement as to the conditions of his return to work.

The previous $500,000 monetary settlement demand of Mr. Hypes has obviously been reduced to $150,000 in light of Maxim's recent desire and willingness to provide him with a reasonable accommodation to resume his employment. The basis for this demand begins with the lost wages that Mr. Hypes has suffered since he was relieved of his employment duties on or about August ___, 2010, and includes consideration of his salary, anticipated sales commissions, and the potential set-off for both short and long-term disability payments that he has received.

Mr. Hypes demand also conservatively encompasses the significant emotional distress, annoyance, inconvenience and similar damages that Mr. Hypes has suffered as a result of Maxim's actions. Further, such a demand conservatively accounts for the attorney fees that Mr. Hypes has acquired by the necessity to retain legal counsel to seek redress for the wrongs committed towards him. As counsel is aware, such attorney fees are due as an additional recovery in the likely event that Mr. Hypes would succeed in litigation.

In agreeing to this monetary settlement, Mr. Hypes would also forego his right to recover for additional claims that he has against Maxim for its conduct towards him up until this point. Such claims include, but are not limited to, those for additional acts of disability discrimination, age discrimination, wrongful discharge, intentional infliction of emotional distress, and punitive damages. For your reference, I have attached to this correspondence a copy of the Complaint that I have drafted on behalf of Mr. Hypes and plan to file should a resolution of this matter not be reached.

Accordingly, such a monetary settlement demand of $150,000 is more than reasonable and generous in light of the circumstances, and remains a prerequisite to Mr. Hypes returning to the employment position from which he should never have been removed. Please note, however, that should the parties be unable to reach an acceptable agreement as to Mr. Hypes' return to work under reasonable accommodations, this monetary settlement offer of $150,000 will be immediately withdrawn.

Should you agree to the terms of the proposal asserted herein, we respectfully request that you indicate such agreement on or before January 23, 2012. Please feel free to contact me directly if you have any further questions.

Sincerest regards,

Sean W. Cook